JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Jose Frances Sattamini d/b/a Indie Crew Customs

**(b)** County of Residence of First Listed Plaintiff   Travis County, Texas
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Offit Kurman, P.C., 1801 Market Street, Suite 2300
Philadelphia, PA  19103; 267-338-1321

## DEFENDANTS

WMI Group, Inc.

County of Residence of First Listed Defendant   Montgomery County, PA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government
  Plaintiff
- ☐ 2  U.S. Government
  Defendant
- ☐ 3  Federal Question
  *(U.S. Government Not a Party)*
- ☒ 4  Diversity
  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                              *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332

Brief description of cause:
Breach of contract and conversion claims stemming from breach of manufacturing and marketing contract

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
150,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
01/20/2016

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

JAN 20 2016

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff:  *1600 BRATTON HEIGHTS DR., AUSTIN, TX  78728*

Address of Defendant:  *3075 Advance Lane, Colmar, PA  18915*

Place of Accident, Incident or Transaction:  *Primarily Montgomery County, Pennsylvania*
(Use Reverse Side For Additional Space)

**16    0243**

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))          Yes☐   No☒

Does this case involve multidistrict litigation possibilities?          Yes☐   No☒

*RELATED CASE, IF ANY:*

Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐   No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☐   No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐   No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐   No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A.  *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
   (Please specify) _____

B.  *Diversity Jurisdiction Cases:*

1. ☒ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I,  *WILLIAM H. PILLSBURY*  , counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE:  *1/20/15*          _____          *93734*
                          Attorney-at-Law                        Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE:  *1/20/15*          _____          *93734*     JAN 20 2016
                          Attorney-at-Law                        Attorney I.D.#

CIV. 609 (5/2012)



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSE FRANCO SATTAMINI d/b/a INDIE     :
CREW CUSTOMS,     :
      :  CIVIL ACTION
      :
      Plaintiff,    :
      :  NO.
      v.     :
      :
WMI GROUP, INC.,    :
      :
      Defendant.   :

## CASE MANAGEMENT TRACK DESIGNATION FORM

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.    ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)    ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.    (X)

| January 20, 2016 | William H. Pillsbury | Plaintiff |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 267-338-1321 | 267-338-1335 | wpillsbury@offitkurman.com |
| **Telephone** | **Fax Number** | **E-Mail Address** |

JAN 20 2016



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSE FRANCO SATTAMINI d/b/a INDIE          :
CREW CUSTOMS                               :
3600 Bratton Heights Drive                 :
Austin, TX  78728,                         :
                                           :   CIVIL ACTION
                  Plaintiff,               :
                                           :   NO. 16      0243
        v.                                 :
                                           :   JURY TRIAL DEMANDED
WMI GROUP, INC.                            :
3075 Advance Lane                          :
Colmar, PA  18915,                         :
                                           :
                  Defendant.               :

## COMPLAINT

### NATURE OF THE ACTION

1.      This is a breach of contract and conversion action between Jose Franco Sattamini

d/b/a Indie Crew Customs ("ICC") and WMI Group, Inc. ("WMI").  In September 2014, ICC

and WMI entered into a contract in which WMI agreed to manufacture, market, and sell ICC

products, called "Holy Shift."  WMI breached the contract in several regards: (1) WMI had

agreed to pay monthly amounts to ICC, but stopped making payments with no explanation in

June 2015; (2) WMI failed to act in good faith in its marketing efforts, resulting in severe

damage to the Holy Shift brand; (3) refusing to abide by Mr. Sattamini's veto of actions despite

his right to veto decisions by WMR; and (4) failure to return property owned by ICC to it

following termination of the contract.  In addition, despite multiple requests, WMI refuses to

return property owned by ICC following termination of the contract, which constitutes

conversion.

## PARTIES

2.     Plaintiff Jose Franco Sattamini is an individual resident of Texas who designs motorcycle parts under the fictitious business name Indie Crew Customs.  Mr. Sattamini and ICC are located at 3600 Bratton Heights Drive, Austin, TX  78728.

3.     Defendant WMI Group, Inc., upon information and belief, is a Pennsylvania corporation engaged in the business of manufacturing, marketing, and sales of machinery and equipment with its principal place of business in Colmar, Pennsylvania.

## JURISDICTION AND VENUE

4.     This Court has original jurisdiction over the claims in this Complaint, which arise under the laws of the Commonwealth of Pennsylvania, pursuant to diversity jurisdiction under 28 U.S.C. § 1332(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

5.     Venue in this matter is proper pursuant to 28 U.S.C. § 1391(b)(1), because WMI resides in this district and all defendants are residents of Pennsylvania.

## THE CONTRACT

6.     WMI and ICC entered into a contract, titled a "Memorandum of Understanding", on September 16, 2014.  A true and correct copy of the contract between ICC and WMI is attached hereto as Exhibit 1.

7.     The contract provides, in relevant part, that "WMI will provide engineering design, manufacturing, sales, marketing, accounting, management and other necessary resources including (but not limited to) legal counseling, at its own cost."  (See Ex. 1 at ¶1.)

8.     ICC maintained ownership of the "prototype design, and its subsequent variations."  (See Ex. 1 at ¶2.)

2

9.      WMI also agree that it would control and manage the "Business Development of Holy Shift"; "Sales and Marketing of these devices"; "Manufacturing of these devices"; and "Training and Operations Manual". (See Ex. 1 at ¶5.)

10.     The Contract further provides that Mr. Sattamini "shall retain the right to veto any decision by WMI after reasonable efforts have been made to resolve any differences between WMI and ICC" and that Mr. Sattamini would "serve in a consulting capacity." (See Ex. 1 at ¶6.)

11.     The contract provided guidelines on how to proceed, including developing an online direct sales platform; expedited "productization and market launch"; "[e]ffective use of social media in marketing the device"; and "[s]trong branding". (See Ex. 1 at ¶7.)

12.     WMI also agreed to pay ICC a monthly consulting fee of $7,000 (seven thousand dollars) on the first day of the month for a period of 24 months from October 1, 2014 or "unless the actual royalties on monthly sales of the device/s exceeds $7,000." (See Ex. 1 at ¶8.)

13.     The parties agree that the contract would remain in full force for a period of three years from the date of inception. (See Ex. 1 at ¶11.)

14.     Termination of the agreement require agreement by both parties and, upon termination, "all legacy systems support will be the responsibility of, and will be provided by WMI." (See Ex. 1 at ¶12.)

15.     Furthermore, upon termination and WMI no longer having interest in Holy Shift, "WMI will surrender the Technical Data Package to ICC or its assignee, at no costs." (See Ex. 1 at ¶4.)

## WMI'S BREACH

16.     Beginning in October 2014, WMI paid the agreed upon monthly consulting fee of $7,000 to ICC.

17.     The parties also worked together to manufacture and market Holy Shift.

3

18.     In February 2015, WMI made the decision, against Mr. Sattamini's objections and without his revisions, to make the website live with sub-standard shopping cart features, inadequate information about the product, and improper security.

19.     In February 2015, WMI made the decision to appear at a vintage motorcycle show and advertise the product, despite Mr. Sattamini's objection that it was premature to do the appearance, given that there was no product inventory, boxes, pricing, whole-sale pricing installation instructions, or a fuller functional website.

20.     In response to Mr. Sattamini's objections, WMI informed him that the investment was just a "test/training run" to prepare for Daytona Bike Week.

21.     In March 2015, WMI made the decision, against Mr. Sattamini's opinion, to appear at the Daytona Bike Show in Florida, without inventory of the final product, only configurations of the product that had not been manufactured and was not in the final useful form.

22.     In addition, WMI went forward against Mr. Sattamini's objection to the Daytona Bike Show in Florida with only a few "last minute" boxes, no instructions, a reference to a subpar website, a poor advertising location, and an unreasonable base price that was did not rely on market standards and was determined without conducting a manufacturing cost analysis.

23.     In March 2015, WMI made the decision, without Mr. Sattamini's knowledge, to send out approximately ninety thousand (90,000) e-mails to prospective customers marketing the product and referring to the website which remained defective.

24.     Specifically, the website continued to have improper security for shopping, broken links, no information on availability of the product, no pictures of the product, and no 3D images of the product.

25.     Mr. Sattamini demanded that this website campaign be terminated because you "never have a second chance to make a first impression" and the website's first impression was detrimental to sales efforts.

26.     Despite Mr. Sattamini's vetoing of the online campaign, WMI persisted in sending e-mails to a total of approximately three hundred thousand (300,000) addresses.

27.     Prior to Memorial Day 2015, WMI again sent out marketing e-mails against Mr. Sattimi's objections referring to the website that remained defective, but reducing the price to $200.00.

28.     The e-mail campaigns did result in about 11,000 unique website visits and about 9,800 users clicked on the "BUY" link, but no sales were made as predicted by Mr. Sattamini who repeatedly warned about the issues with the sales strategy and website and anticipated no sales due to WMI's failure to use accepted practices for marketing.

29.     ICC took it upon itself to fix the website by expending its own resources.

30.     These repairs were delayed by WMI, who refused to authorize the website changes, resulting in continued damage to the product and the brand.

31.     Furthermore, WMI also refused to maintain proper inventory control, which in turn caused the inability to inform customers about product availability.

32.     WMI also improperly claimed the shopping cart feature was secure and, when it was discovered by the public that the shopping cart was not public, it caused detriment to product and brand image as the problems were discussed on motorcycle forums.

33.     Also, WMI had failed to establish manufacturing costs and, therefore, could not set a price point based on these cost based on quantity, so it was impossible for ICC to market the product to prospective resellers who had expressed interest in the product.

5

34.     In April 2015, WMI proposed a new contract with terms more favorable to WMI, which ICC refused to sign.

35.     In addition, WMI had two people market the "Holy Shift Sport Model" randomly to shops around their location to "see what kind of interest they could generate on the product" without any strategy, proper product presentation, pricing and wholesale pricing, or any proper commerce practice whatsoever, resulting in further diminishing the brand.

36.     In Spring 2015, Mr. Sattamini offered to open a conversation regarding terminating the agreement if WMI was no longer interested in the product.

37.     WMI did not respond to the request to end the relationship between WMI and ICC.

38.     In May 2015, WMI halted all marketing and manufacturing efforts, without consulting ICC.

39.     WMI's breach of the contract by failing to abide by Mr. Sattamini's veto or not consulting with him and failure to act in good faith in how it handled the marketing resulted in the diminution of the value of Holy Shift and lost potential revenue in excess of $1 million dollars.

40.     In June 2015, WMI stopped paying the $7,000 monthly consulting fee without any explanation.

41.     Between June 2015 and August 2015, WMI and ICC made various offers to attempt to continue the business relationship, as well as ICC demanding the agreed upon monthly consulting fee.

6

42.     On August 10, 2015, WMI represented that it had no contractual obligation to pay the monthly consulting fee because the contract was not binding and that the monthly consulting fee was not owed because no sales had been made.

43.     On September 4, 2015, ICC sent a letter stating that it agreed with WMI that the contract should be terminated and demanding the property owned by ICC be returned to it following the mutual termination of the contract.

44.     On September 23, 2015, WMI responded that it agreed with termination of the contract, denied any wrongdoing, but agreed to return "any design drawings, manufacturing/assembling procedures, and/or training documents/manuals that were created in support of the Holy Shift device ("Technical Data Package"), at no cost."

45.     In that same e-mail, WMI demanded payment for the return of "prototypes, manufactured product, email lists, contacts, statistics, etc., created in support of the Holy Shift device."

46.     On September 30, 2015, ICC again requested its property from WMI.

47.     On October 19, 2015, WMI again agreed to provide the "Technical Data Package" at no cost, and would be willing to discussing terms to return the other products to ICC, but made all of these conditional on ICC signing a Mutual Release Agreement.

48.     On October 23, 2015, ICC again reiterated that WMI must return its property and that it would review the terms of the Mutual Release Agreement.

49.     To date, WMI has not returned ICC's property to ICC, but is withholding it in order to obtain a release.

## COUNT I
## BREACH OF CONTRACT

50.     ICC incorporates by reference each of the foregoing allegations as if the same were set forth herein at length.

51.     ICC and WMI mutually agreed to the terms of the Memorandum of Understanding.

52.     Both parties received valued consideration under the terms of the Memorandum of Understanding.

53.     Both parties were competent and the signatories to the contract had capacity to enter into the contract on behalf of the respective parties.

54.     As such, the Memorandum of Understanding is a valid and enforceable contract between the parties.

55.     Under the Memorandum of Understanding, WMI was obligated to pay a monthly consulting fee of $7,000 for two years from October 2014.

56.     Beginning in June 2015 and continuing until termination of the contract in September 2015, WMI has breached the Memorandum of Understanding by refusing to make these payments.

57.     As a direct and proximate result of WMI's breach of payment of the monthly consulting fees, ICC has suffered damages of $28,000 plus interest for the failure to pay consulting fees.

58.     Under the Memorandum of Understanding, WMI was obligated to perform its contractual obligations in good faith.

59.     Under the Memorandum of Understanding, WMI was to consult with Mr. Sattimi on decisions and Mr. Sattimi had the right to veto decisions by WMI.

8

60.    WMI continually ignored or did not consult Mr. Sattimi in making important marketing decisions and failed to perform basic marketing in a good faith manner.

61.    Specifically, WMI's breach includes:

    a.  failure to build a functioning website;

    b.  failure to properly market the Holy Shift product at events;

    c.  performing two email marketing campaigns without the necessary infrastructure to make sales;

    d.  failure to establish a price point, which is essential to marketing the Holy Shift product; and

    e.  failure to appropriately market the Holy Shift product or consult with Mr. Sattimi on marketing decisions.

62.    As a direct and proximate result of WMI's breach of good faith performance, the value of the Holy Shift product line was diminished and ICC lost over $125,000 in prospective royalties from prospective customers who were interested in purchasing product, but unable to buy product.

63.    Under the Memorandum of Understanding, upon termination of the agreement, WMI was required to return the Technical Data Package and "all legacy systems support."

64.    WMI has breached the Memorandum of Understanding by improperly failing to return this property to ICC.

65.    As a direct and proximate result of WMI's breach of its obligation to return property, ICC has been limited in its marketing and development efforts of the Holy Shift product after termination and has suffered damages that were reasonably foreseeable as a result of WMI's breach.

WHEREFORE, ICC seeks judgment in their favor as to Count I as follows:

(a)     The entry of an award requiring WMI to pay to ICC all monetary damages suffered by ICC caused by their breach, including, without limitation, overdue monthly consulting fees, other compensatory damages, consequential damages, prejudgment interest, post-judgment interest, and attorney's fees and costs; and

(b)     The award of such additional relief as the Court deems just and appropriate.

## COUNT II
## CONVERSION

66.     ICC incorporates by reference each of the foregoing allegations as if the same were set forth herein at length.

67.     WMI was contractually and legally obligated to return to ICC the Technical Data Packages and "all legacy systems support."

68.     The Technical Data Packages and "all legacy systems support" are the property of of ICC.

69.     ICC has demanded the return of this property, and WMI has refused to comply without justification.

70.     WMI's actions constitute a wrongful conversion of ICC's property.

71.     As a direct and proximate result of WMI's wrongful conversion, ICC has suffered damages.

WHEREFORE, ICC seeks judgment in their favor as to Count II as follows:

(a)     The entry of an award requiring WMI to pay to ICC all monetary damages suffered by ICC caused by its wrongful conversion, including without limitation, compensatory damages, consequential damages, prejudgment interest, post-judgment interest, and attorneys' fees and costs;

(b)     An order requiring that WMI return ICC's property to ICC; and

(c)     The award of such additional relief as the Court deems just and appropriate.


Dated: January 20, 2016                    **OFFIT KURMAN**

                                           _____
                                           William H. Pillsbury, Esq. (I.D. No. 93734)

4852-1628-2668, v.  1

# EXHIBIT 1

## Memorandum of Understanding

This letter dated September 16, 2014 shall serve as the basis of an agreement between WMI Group Inc. (WMI), located at 3075 Advance Lane, Colmar, PA 18915 and Indie Crew Customs (ICC) located at 60 Lower Ridgeview Corcle, Unit D, East Stroudsburg, PA 18302,

as both parties proceed forward towards establishing Worldwide Exclusive Distribution Rights for WMI for the Holy Shift device and Revolution Pegs (herein referred to as "Holy Shift") and other related devices under development by ICC.

It is mutually understood and agreed that ICC has developed, as of September 16, 2014, a working prototype of Holy Shift and has successfully demonstrated its capability to WMI. It is further understood and agreed that ICC or its principal, Jose Sattamini, has filed a Provisional Patent Application to the US Patent Office (

and will file for a utility patent within the year. Such filing may be executed jointly, on behalf of Jose Sattamini (inventor). WMI will share technical drawings necessary for filing the aforementioned utility patent.

It is also clearly understood and agreed that WMI can offer the resources necessary to speed up the process of productizing this device and reaching the market in an agile and  expeditious manner, by means of generating larger initial production and inventory with turnkey manufacturing, packaging, warehousing, production management, marketing and sales.

In order to achieve the objectives stated above, the two parties agree to the following:

1. WMI will provide engineering design, manufacturing, sales, marketing, accounting, management and other necessary resources including (but not limited to) legal counseling, at its own cost.

2. ICC or its principal will own the prototype design, and its subsequent variations (e.g. size adaptations for other style motorcycles).

3. WMI and ICC (or its principal) will jointly own the intellectual property rights to future designs of current product and new related devices developed under this agreement.

4. WMI will own the Technical Data Package developed under this agreement, which includes detailed design drawings, manufacturing/assembly procedures, configuration management, training documents/manuals and other related documents.
   In the event WMI no longer has interest in, or is incapable of sustaining the continuity of the development and sales of these products, WMI will surrender the Technical Data Package to ICC or its assignee, at no cost.

5. The following business activities will be controlled and managed by WMI:

- Business Development of Holy Shift, Revolution Pegs and other related devices

- Sales and Marketing of these devices

- Manufacturing of these devices

- Training and Operation Manuals of these devices

It is clearly understood and agreed that any and all efforts are fundamental for the success of this joint enterprise. As such, it is fundamentally important that Jose Sattamini continues to "work the trenches" including but not limited to the following areas:

- Participating in forums;
- Participating in social media;
- Participating in "Bike Shows" and other product demo opportunities;
- Procuring and leveraging endorsements (racers, artists, etc.);
- Other activities reasonably requested WMI.

6. As the inventor of the Holy Shift device, the principal at ICC,  Jose Sattamini, shall retain the right to veto any decision by WMI after reasonable efforts have been made to resolve any differences between WMI and ICC.

A.  Jose Sattamini will serve in a consulting capacity, overseeing areas such as design and engineering, sales and marketing. Such activity shall not in any way, constitute a relationship of employment between the parties.
B. In the event  Jose Sattamini cannot be reached within a reasonable timeframe, is incapable  or no longer has the desire to fulfill this capacity, WMI shall have the right to pursue the actions and decisions deemed necessary to properly perform its activities.

7.  Both parties agree that in order to be successful in their joint initiative, they will follow these guidelines:

- Develop an online direct sales and marketing presence in lieu of utilizing distributors

- Expedited productization and market launch

- Effective use of social media in marketing the device

- Interactive marketing efforts

- Strong branding – highlighting disruptive aspect of the device

- Outstanding quality control and customer service

- Continued enhancements of product design, styles and models

8. WMI agrees to pay ICC 11% of the gross unit price of any device developed under this agreement.

A. In addition, WMI will pay ICC an advance on future royalties in the form of a monthly consulting fee in the amount of $7000.00 (Seven thousand dollars only) on the first day of the month. These payments will commence on October 1st, 2014

and will continue for a period of 24 months or unless the actual royalties on monthly sales of the device/s exceeds $7000.00, whichever event occurs first. Such advance is made in consideration to the following:

i. Jointly understood and agreed upon need for ICC to maintain intense dedication and work for the success of this project during the course of the initial first year of launch of the products.

ii.. While ICC is free to develop other products on its own, ICC will grant WMI during the duration of this agreement and its subsequent renewals, RIGHT OF FIRST REFUSAL on any and all subsequent motorcycle products developed, invented and/or created by ICC.

iii.. ICC will provide WMI with on-going services of audio/video recording, editing and mastering at its productions studios, as reasonably requested by WMI's Marketing Department, at ICC's own cost (within the limits of its current and or future capabilities).

iv. ICC will explore, share and provide all of its pertinent resources in foreign countries such as Brasil, in order to assist WMI with such markets.

9. The principals of ICC agree to provide full disclosure of any/all existing/current legal and financial liabilities; if any such liabilities exist at the date of the inception of this agreement, such liabilities shall not transfer to WMI and its associated common ownership companies and will remain the responsibility of ICC and its principal. In the same manner, and for the same effect, no financial liability from WMI, currently or future, shall transfer to ICC and/or its principals.

10. All parties agree that this is the only compensation agreement between the parties; that no other compensation agreements between the parties can be made except in writing and made a part of this document, and that no other persons or commercial entities can be made a party to this agreement at any time.

11. The agreement shall remain in full force and effect for a period of three (3) years) from the date of its inception. The agreement shall be renewable for a period of 3 years at its anniversary provided both parties mutually consent to such renewal. Termination at any time prior to that date can only be effected by amending this document and with the mutual consent of the parties; any extension to this document can only be effected by amending it in writing with the mutual consent of the parties.

12. In the event that both parties agree to terminate this agreement in the future, all legacy systems support will be the responsibility of, and will be provided by WMI

13. It is a requirement that no party to this agreement shall divulge, reveal, or disclose to any outside party, any third party vendor, to any clients or their representatives, directly or indirectly, the terms of this agreement, or the provisions and scope of this agreement, in whole or in part. The sole exceptions to this provision shall be in cases where such disclosure is required by law or by mutual consent of the parties themselves.

14. This agreement and any and all payments made by WMI to ICC shall comply with all applicable laws and regulations of the United States and the State of Pennsylvania including but not limited to the Foreign Corrupt Practices Act and all regulations of the Internal Revenue Source Code of Procedures.

**AGREED AND ACCEPTED:**

WMI Group Inc.

By: _____

Name: Ajit Gene Samsi

Title: Chief Operating Officer

Date: September 16, 2014

Indie Crew Customs

By: _____

Name: JOSE SANTAMARIA

Title: OWNER

Date: 9/23/2014